[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: PLAINTIFF'S AMENDED MOTION TO MODIFY CODED #171
CT Page 10620 AND DEFENDANT'S MOTION FOR COUNSEL FEES CODED #172
Many of the facts that give rise to these motions are not in dispute. The marriage between the parties was dissolved by memorandum of decision dated June 14, 1996 and coded #133. That memorandum of decision provided in part as follows:
 "The plaintiff is fifty years old. He is licensed and practicing attorney and has been so since 1969. He has an undergraduate degree from the University of Pennsylvania and a law degree from the University of Connecticut. He is currently being treated for clinical depression. migraine headaches and chronic respiratory problems. None of these conditions prevent him from being actively and fully engaged in the practice of law. . . .
 The parties offered sharply divergent views of the current viability of the plaintiff's law practice. The plaintiff claims that he worked long hours and made little money. The depressed economy in Connecticut resulted in few commercial real estate deals. Many of his clients were forced to file bankruptcy and failed to pay substantial attorney's fees owed him.
 The defendant asserts that the plaintiff has had a thriving law practice. The firm's gross income during the years 1991 through 1994 was exceptionally high. Any failure on the plaintiffs part to generate a substantial net income is due to unreported income or to faulty business practices.
 There was no material dispute between the experts as to the amount of gross income received by the plaintiff. Using the figures compiled by the plaintiffs expert, the plaintiff collected gross incomes of $279,317, $321,019 and $257,345 for the years 1992, 1993 and 1994 respectively. The one area most in dispute at trial was the financial condition of the plaintiffs law practice. On this issue, the plaintiffs testimony was consistently not worthy of belief. In preparation for filing for a dissolution and during the course of the dissolution proceeding itself, the plaintiff misrepresented his financial situation and attempted to manipulate his income. CT Page 10621
 The evidence presented at trial demonstrates that the plaintiff's law practice did not fall victim to changing tax laws, a depressed economy and bankrupt clients as suggested by the plaintiff. Although these factors did adversely impact his practice to some degree and his compensation would have been even better had they not occurred, the overriding reason for the limited net income provided in recent years by his law firm was bad business practices.
 The reduced income that the plaintiff has received in recent years is directly attributable to his poor business practices. The plaintiff can and should initiate changes that will restore his annual income to its prior substantial level.
 It is well established that in a dissolution action a court may look at the earning capacity of a party in determining its financial awards. Venuti v. Venuti, 185 Conn. 156, 161 (1981); Lucy v. Lucy, 183 Conn. 230, 234 (1981); Miller v. Miller, 181 Conn. 610, 61 1-12 (1980). It is appropriate to look at the plaintiff's earning capacity in this case for a number of reasons.
 His employment history shows that he is capable of earning an annual income far greater than his recent record indicates. When employed by others and not in business for himself, he eariied compensation substantially greater than $100,000.00 annually.
 Moreover, the plaintiffs seriously flawed business practice when conducting his own law practice have unnecessarily diminished his annual income. Those practices are relatively easy to correct. See Vandal v. Vandal, 31 Conn. App. 561, 567 (1993) in which the appellate court upheld financial awards based on earning capacity where the trial court found that a party could earn more through better business practices.
 Finally, if the plaintiff is to be believed, he is voluntarily giving up the full time practice of law. It is particularly appropriate to utilize a party's earning capacity when he has unilaterally decided to limit his income. Miller v. Miller, 181 Conn. 610 (1980) and Hart v. Hart, 19 Conn. App. 91 (1989). CT Page 10622
 The court finds that the plaintiff has an earning capacity of $100,000.00 net income annually. There are three bases for this finding. First, Mark Harrison stated that, in his expert opinion, the plaintiff has a net earning capacity of "no less than $100,000" per year. Hi opinion was based on the plaintiff earning $200 per hour and performing between 1, 000 and 1,500 billable hours each year. The plaintiff's base hourly rate for 1994 and 1995 was $200 per hour. Harrison also testified that the plaintiff performed in excess of 1,500 billable hours in 1991, 1992 and 1993. Second, it is reasonable to expect that the plaintiff can earn 50% of his gross income as net income on an annual basis. Harrison stated that the plaintiff's net income should be less than 50% of his gross income. He based his opinion upon his experience that the usual percentage for attorneys in Connecticut was 50% and upon a 1994 small law firm survey issued by Altman Weil Pensa. The survey showed that the average net income for firms in the United states of one to twelve lawyers was 52.7% of gross income and the average net income for firms in the northeast of two to five attorneys was 52.5%.
 For each of the years 1991, 1992, 1993 and 1994, the plaintiff's gross income amply exceeded $200,000 per year.[5] The implementation of basic changes to his business practices should enable the plaintiff to realize the average net income percentage of 50%.
 Third, the plaintiffs earning history demonstrate that he has received compensation well in excess of $100,000 when he has not been self employed. He received salary and bonuses between $125,000 and $175,000 while employed at Cheshire Management Company and a salary of $115,000 while at Hoberman and Pollack. Should the plaintiff be unwilling or unable to make the rudimentary changes in his business practices necessary to increase the net income from his own law practice, he can seek employment elsewhere that will pay him what his employment record shows he is worth." (Emphasis provided)
There were thus two separate basis for the finding that the plaintiff had earning capacity of $100,000 net income annually, namely his ability to generate that income from his own law practice and his ability to generate that income as an employee of another law office when he has not been self employed.
 The plaintiff's motion to modify makes the following CT Page 10623 allegations:
 1. ". . . plaintiff . . . represents that there has been a substantial change in his financial circumstances since the date of the entry of said alimony order."
 2. "The plaintiff "s circumstances have substantially changed since the entry of said order in that the plaintiffs income and earnings are substantially below those attributed him as his "earning capacity' by the Court at the time of the entry of the decree."
 3. ". . . plaintiff has been employed full-time since the date of the judgment and has attempted, on an ongoing basis, to seek full time employment as an attorney. He has made continuing efforts to conduct an independent law practice, but has failed in all of his efforts to obtain full-time employment.
 4. "As an attorney he has earning (sic) substantially less than $100,000.00 per year.
 5. "In addition to his full-time employment, and his part-time efforts to conduct a law practice, the plaintiff has also worked as a paid arbitrator as and when that work was available to him.
 6. "The plaintiff "s professional malpractice insurer carrier has declined to renew his coverage, further reducing the plaintiff's earning capacity."
The threshold issue before the court is whether plaintiff has proven a substantial change in circumstances since the date of dissolution at June 14, 1996. The substantial change in circumstances that must be proven in the case relate to the plaintiffs ability to generate a net annual income of $100,000 from his own practice of law and his ability to generate a net annual income of a $100,000 from working for another law firm.
The court finds that following additional facts:
The plaintiff is presently employed as the Executive Director for the Railroad Museum of New England, Inc. His gross weekly salary is $865.38 and his net weekly income is $503.02. He has dividend income, interest income and K-1 income averaging $97.71 CT Page 10624 weekly. He has miscellaneous legal fees and American Arbitration Association income grossing $183.82 weekly less expenses of $91.91 weekly for a net weekly income from arbitration/law practice of $91.91 weekly, which when added to his dividend interest and K-1 income amounts to $189.62 weekly, less deductions for federal and state taxes of $58.78 weekly, for a net other income of $134.84 weekly. He has been employed by the Railroad Museum of New England, Inc. since the divorce. He commenced employment there at an annual income of $15,000.00. In 1997 his gross income was doubled to $30,000.00. in May of 1998 his gross income was increased to $45,000.00 annually. The plaintiff claims that since the date of dissolution of June 14, 1996 that there has been three changes of circumstances as follows:
1. Since 1996, the plaintiff's mental health has deteriorated so that, in the opinion of this psychiatrist, he is not suitable to practice law.
2. Even if he were able to practice law, there are virtually no clients demanding the plaintiff's services as a lawyer.
3. Since the date of dissolution, the plaintiff has withdrawn over $52,000.00 from his IRA to pay the court ordered alimony. He has never defaulted in the court ordered obligation, although is assets are being rapidly depleted.
These claims will be considered seriatim.
I THE PLAINTIFF'S CLAIM THAT SINCE 1996 THE PLAINTIFF'S MENTAL HEALTH HAS DETERIORATED SO THAT IN, THE OPINION OF HIS PSYCHIATRIST, HE IS NOT SUITABLE TO PRACTICE LAW.
In discussing modification or termination of alimony the court in Borkowski v Borkowski, 228 Conn. 729 (1994) stated in part at page 734, 735, 737, 738, and 739 as follows:
 General Statutes § 46b-86 governs the modification or termination of an alimony or support order after the date of a dissolution judgment. When, as in this case, the disputed issue is alimony, the applicable provision of the statute is § 46b-86 (a), which provides that a final order for alimony may be modified by the trial court "upon a showing of a substantial change in the circumstances of either party." Under that statutory provision, the party seeking the CT Page 10625 modification bears the burden of demonstrating that such a change has occurred. Because a request for termination of alimony is, in effect, a request for modification, this court has treated as identical motions to modify and motions to terminate brought under § 46b-86 (a). . . .
 After the evidence introduced in support of the substantial change in circumstances establishes the threshold predicate for the trial court's ability to entertain a motion for modification, however, it also naturally comes into play in the trial court's structuring of the modification orders. . . .
 The original decree or any subsequent order is an adjudication by the trial court as to what is right and proper at the time it is entered. To obtain a modification, the moving party must demonstrate that circumstances have changed since the last court order such that it would be unjust or inequitable to hold either party to it. Because the establishment of changed circumstances is a condition precedent to a party's relief, it is pertinent for the trial court to inquire as to what, if any, new circumstance warrants a modification of the existing order. In making such an inquiry, the trial court's discretion is essential. The power of the trial court to modify the existing order does not, however, include the power to retry issues already decided; or to allow the parties to use a motion to modify as an appeal. Rather, the trial court's discretion includes only the power to adapt the order to some distinct and definite change in the circumstances or conditions of the parties.
 Applicable to dissolution actions, as well as to other kinds of litigation, is the principle that an adjudication by a court having jurisdiction of the subject matter and the parties is final and conclusive not only as to matters actually determined, but as to matters which the parties might have litigated as incident thereto and coming within the legitimate purview of the subject matter of the action. Id. This policy of avoiding duplicitous litigation is particularly important in the context of family law where courts should "welcome the opportunity to ease the burden of post divorce litigation over enforcement or modification of alimony claims." A court having performed its function of ruling upon a controversy, cannot be taken over by the litigants for the continued readjudication and reconsideration of their affairs. To allow otherwise would waste time and leave CT Page 10626 an undesirable uncertainty in the economic affairs of the parties. (Emphasis provided.)
In this case there was a finding by the trial court that the plaintiff had an earning capacity of $100,000 net income annually. That earning capacity was based on what he could earn from his own law practice as well as what he could earn from working for another law firm. The trial court also found that although the plaintiff was currently being treated for clinical depression, migraine headaches and chronic respiratory problems, that none of these conditions prevent him from being actively and fully engaged in practice of law. These findings are final and cannot be relitigated.
The plaintiff makes the following claim in support of his argument that since 1996 his mental health has deteriorated so that, in the opinion of his psychiatrist, he is not suitable to practice law.
 More importantly, and overriding his continued willingness to operate a private law practice, are his mental and emotional problems which are, in part, related to those efforts to operate a private practice. It is that mental and emotional illness which Dr. Sholomskas testified is, in part, aggravated by and adversely affected by his struggle to continue in the practice of law. It is noted that the defendant herself offered evidence that no evidence of mental or emotional illness of the plaintiff was offered at trial. Where an obligor's reduction in his income and/or his earning capacity results from less than voluntary circumstances, modifying alimony is the means to reach a just result. See Bronson v. Bronson, 1 Conn. App. 337 (1984). See also Epstein v. Epstein, 43 Conn. Sup. 400 (1994). The existence and severity of the plaintiffs mental and emotional condition present a substantial change in circumstances . . . we know that he now has an identified and diagnosed health condition which does, and in truth should, prevent him from operating a private law practice. His psychiatrist testified credibly that Mr. Gamin suffers from depression which makes running his own law practice inappropriate, if not impossible. As the psychiatrist stated, Mr. Gamin is not suited to operate a law practice at this time. The malpractice claims filed against him and his inability to secure malpractice insurance substantiate his lack of skills and/or temperament to successfully run a law practice at that time. To mandate that he do so would be a disservice to him, as CT Page 10627 well as to the public at large. On the other hand, it would be imprudent for him to surrender his law license for the obvious reason that it may be of some value in the event that the professional search firm that he hired finds an alternate employment that would value his being a member of the Connecticut Bar. His full time job which pays him a respectable salary, now prohibits him from accepting any private law clients. He is, however, permitted to seek out and accept engagement as arbitrator and is willing to do so as and when any opportunities are presented to him.
The court is not persuaded by that argument.
In this hearing the plaintiffs psychiatrist, Dr. Alan Sholomskas, testified that the plaintiff suffers from a number of personality disorders including depression that prevents the plaintiff from operating a private law practice. He further testified that the plaintiffs mental conditions existed at the time of dissolution and prior to that time. The testimony of the plaintiff's psychiatrist does not demonstrate that circumstances have changed since the dissolution decree entered on March 14, 1996. The plaintiff cannot retry issues that have already been decided, namely, that the plaintiff's depression that existed at the time of dissolution did not affect his ability to practice law. There has therefore been no credible evidence presented of any change in circumstances since the date of dissolution relating to the plaintiff's ability to practice law.
The plaintiff further argues that he has made attempts to obtain employment through other law firms and has not been successful. The court is not persuaded by that argument for a number of reasons. First, the plaintiff did not commence seeking outside employment with law firms until March 15, 1997 and he sent out eighteen letters. He has not sent out any letters after March 15, 1997. He informed his psychiatrist on December 14, 1998 that his services were in demand in other states where real estate was booming.
From all of the evidence presented, the court finds that the plaintiff has failed to meet his burden of proving that there has been any reduction in his earning capacity from his ability to engage in the private practice of law and from his ability to work for another law firm.
II THE PLAINTIFF'S CLAIM THAT EVEN IF HE WERE ABLE TO PRACTICECT Page 10628 LAW, THERE ARE VIRTUALLY NO CLIENT'S DEMANDING THE PLAINTIFF'S SERVICES AS A LAWYER.
The court is not persuaded by that argument for a number of reasons. First the plaintiff has closed down his practice of law and there is no credible evidence substantiating his claim that there are no clients demanding his services as a lawyer. Secondly, since the date of dissolution the plaintiff has turned away some clients who came to him and referred them to other attorneys.
Having closed down his private practice of law he cannot now complain that he does not have the income from that private practice of law.
III THE PLAINTIFF'S CLAIM THAT THE SINCE THE DATE OF DISSOLUTION, THE PLAINTIFF HAS WITHDRAWN OVER $52,000 FROM HIS IRA TO PAY THE COURT ORDERED ALIMONY.
The court is not persuaded by that argument. While it is true that the plaintiff has withdrawn funds from his IRA, nevertheless it is also true that the plaintiff voluntarily reduced his income by taking his present position. The court further finds that the present employment of the plaintiff pays him substantially less than he has the capacity to earn and it is as a result of his reduced earnings that he has had to withdraw funds from his IRA. Therefore, this is not a basis for a reduction in alimony.
The remaining issue before the court is the defendant's motion for counsel fees under the provision of Connecticut General Statutes § 46b-62.
In addition to the facts previously found the court also finds the following facts. The plaintiff presently has weekly expenses of $1,096. He has liabilities totaling $134,775.82. In addition to personal property assets totaling $2,700, he has bank accounts totaling $1,590 and stocks with a value of $258.48. His cash surrender value of life insurance is $569.96. He has deferred compensation plans totaling $24,071.52 and other assets totaling $16,431.32.
The defendant is employed as a bookstore manager grossing $360 weekly and netting $299 weekly. She has dividend/interest income of $90 weekly less $53 weekly for federal and state taxes. She has income from property gross weekly of $43 less federal and CT Page 10629 state taxes $12 weekly. Her weekly expenses amount to $1,319. She has liabilities that total $27,793. She has equity in her residence of $85,350 and equity in another piece of real estate of $39,120. Her bank accounts total $5,021. She has stocks and bonds with a total value of $120,812. Her IRA has a value of $8,175. She has other assets with a value of $7,500.
Based on all the evidence presented the court denies the defendant's request for counsel fees.
 ORDER 1. The plaintiffs motion to modify is denied.
2. The defendant's motion for counsel fees is denied.
3. In the event the defendant claims that there is any arrearages that issue is reserved for a separate hearing.
Sidney Axelrod, Judge